1  Daniel Cooper (SBN 153576)
   daniel@sycamore.law
2  Jesse C. Swanhuyser (SBN 282186)
3  jesse@sycamore.law
   Jessica D. Hollinger (SBN 344211)
4  jessica@sycamore.law
5  SYCAMORE LAW, INC.
   1004 O'Reilly Avenue, Ste. 100
6  San Francisco, CA 94129
7  Tel: (415) 360-2962

8
   Barak Kamelgard (SBN 298822)
9  Barak@lawaterkeeper.org
   Benjamin Harris (SBN 313193)
10 Ben@lawaterkeeper.org
11 LOS ANGELES WATERKEEPER
12 360 E 2nd Street Suite 250
   Los Angeles, CA 90012
13 Tel: (310) 394-6162
14 Fax: (310) 394-6178

15 Attorneys for Plaintiff
16 LOS ANGELES WATERKEEPER

17              **UNITED STATES DISTRICT COURT**

18             **CENTRAL DISTRICT OF CALIFORNIA**

19

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a public benefit non-profit corporation, | Case No. _____ |
| Plaintiff, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES |
| vs. | |
| UNIVERSITY OF CALIFORNIA, LOS ANGELES, a public entity, | |
| Defendant. | Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387 |

## I.  JURISDICTION AND VENUE

1.  This is a civil action brought under the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1251 *et seq*.

2.  This Court has subject matter jurisdiction over Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff") and University of California, Los Angeles ("UCLA" or "Defendant") (collectively the "Parties") and over the subject matter of this action pursuant to section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

3.  This complaint ("Complaint") seeks relief for ongoing violations by UCLA of the Clean Water Act, and the terms and conditions of the *National Pollutant Discharge Elimination System Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ*, as amended by *Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, Order No. 2014-0057-DWQ,* and as amended on November 6, 2018 ("General Permit"), related to polluted storm water and non-storm water discharges from the Co-Generation facility owned and operated by UCLA at and near 731 Charles E. Young Drive South, Los Angeles, California 90095 ("Co-Gen Facility" or "Facility").

4.  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration) and 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties).

5.  Prospective citizen plaintiffs must, as a jurisdictional prerequisite to

enforcing the Clean Water Act in Federal District Court, prepare a Notice of Violation and Intent to File Suit letter ("Notice Letter") containing, *inter alia*, sufficient information to allow the recipient to identify the standard, limitation, or order alleged to be violated, the activity alleged to constitute the violations, the location of alleged violations, and the date or dates of such violations. 33 U.S.C. § 1365(a); 40 C.F.R. § 135.3(a).

6. The Notice Letter must be sent via certified mail at least sixty (60) days prior to filing a complaint ("Notice Period") to the owner of the facility alleged to be in violation of the Act and, where the alleged violator is a corporation, to the corporation's registered agent for service of process. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(a)(1).

7. A copy of the Notice Letter must be mailed to the Attorney General, U.S. Department of Justice ("U.S. DOJ"), the Administrator of the U.S. Environmental Protection Agency ("U.S. EPA"), the Regional Administrator of the U.S. EPA for the region in which a violation is alleged to have occurred, and the chief administrative officer for the water pollution control agency for the State in which the violation is alleged to have occurred. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(b)(1)(A).

8. On June 28, 2023, Plaintiff sent a Notice Letter via certified mail to UCLA and its registered agent for service of process. The Notice Letter described ongoing violations of the Act and General Permit at the Facility, and provided notice of Plaintiff's intention to file suit against Defendant at the expiration of the Notice Period. A true and accurate copy of the Notice Letter as provided to UCLA is attached to, and incorporated by reference into, this Complaint at EXHIBIT 1.

9. The Notice Letter was received by Gene D. Block, UCLA's Chancellor, Michael J. Beck, UCLA's Administrative Vice Chancellor, and Kelly Schmader, UCLA's Assistant Vice Chancellor of Facilities Management, Energy Services & Utilities on July 3, 2023.

10. The Notice Letter was received by the General Counsel of The Regents of the University of California on July 5, 2023.

11. The Notice Letter was also received by Merrick Garland, the U.S. Attorney General on July 6, 2023; Michael Regan, Administrator of the U.S. EPA on July 5, 2023; Eileen Sobeck, Director of the State Water Resources Control Board on July 3, 2023; and Renee Purdy, Executive Officer of the L.A. Regional Water Quality Control Board on July 3, 2023.

12. More than sixty (60) days have passed since the Notice Letter was served on UCLA, and the State and Federal agencies.

13. Plaintiff is informed and believes, and thereon alleges, that neither the U.S. EPA nor the State of California has commenced or is diligently prosecuting a court action to redress violations alleged in the Notice Letter and this complaint.

14. Plaintiff's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Act. 33 U.S.C. § 1319(g).

15. Venue is proper in the Central District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

LA Waterkeeper, by and through its counsel, hereby alleges:

///

## II.   **INTRODUCTION**

16.   This Complaint seeks relief for unpermitted and unlawful discharges of pollutants, polluted storm water, and polluted non-storm water from UCLA's Co-Gen Facility to waters of the United States in violation of the Act and General Permit.

17.   With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, like those conducted by Defendant, flow into Los Angeles' storm drains and contaminate local streams, creeks, rivers, estuaries, harbors, bays, beaches, and coastal waters.

18.   The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering local creeks and rivers each year. *See*, *e.g.*, Steven Bay et al., *Study of the Impact of Stormwater Discharge on Santa Monica Bay* (1999).

19.   Numerous scientific studies in recent decades have documented serious health risks to recreational users of Southern California's waters from pollutant-loaded storm water and non-storm water discharges. *See*, *e.g.*, Michael K. Stenstrom, *Southern California Environmental Report Card: Stormwater Impact* 15 (1998); Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* 205 (2000).

20.   A landmark epidemiological study showed that people who swam directly in front of storm drain outlets into Santa Monica Bay were far more likely to experience fevers, chills, vomiting, gastroenteritis, and similar health effects than those who swam 100 or 400 yards away from the outlets. Robert W. Haile et al., Santa Monica Bay Restoration Project, *An Epidemiological Study of Possible Adverse*

*Health Effects of Swimming in Santa Monica Bay* 5 (1996).

21. Los Angeles' waterways, including Sepulveda Canyon Channel, Ballona Creek, Ballona Creek Estuary, Santa Monica Bay, and connected coastal and ocean waters, are ecologically sensitive areas, and are essential habitat for dozens of fish and bird species, as well as invertebrate species.

22. Los Angeles' waterways provide numerous recreational activities, including swimming, surfing, SCUBA diving, and kayaking.

23. Los Angeles' waterways also provide non-contact recreation, aesthetic, and spiritual opportunities, such as hiking, running, biking, and wildlife observation.

24. Industrial facilities, like Defendant's, that discharge storm water and non-storm water contaminated with sediment, heavy metals, trash, and other pollutants contribute to the impairment of surface waters and aquatic dependent wildlife, expose people to toxins, and harm the special social and economic benefits Los Angeles' waterways have for locals and visitors alike.

25. Discharges of polluted storm water and non-storm water to local surface waters pose carcinogenic, developmental, and reproductive toxicity threats to the public (including LA Waterkeeper members), adversely affect the aquatic environment, and impair the tourist economy on which much of the region depends.

26. These contaminated discharges can and must be controlled as required by the CWA for ecosystems to regain their health and to protect public health.

27. Controlling polluted storm water and non-storm water discharges associated with industrial activity is vital to protecting Southern California's surface and coastal waters, and essential to LA Waterkeeper's mission.

28. Defendant is liable under the CWA for its past and ongoing failures to comply with the Act, including failures to comply with EPA-approved effluent limitation guidelines, the General Permit's discharge prohibitions, technology-based and water quality-based effluent limitations, planning and monitoring requirements, remedial action requirements, and other procedural and substantive requirements. *See* 33 U.S.C. §§ 1342, 1365.

29. Defendant is liable for daily, monthly, and annual violations of the General Permit since at least June 28, 2018. *See* 33 U.S.C. §§ 1311(a), 1319(d); 40 C.F.R. § 19.4.

## III. THE PARTIES

### A. LA Waterkeeper

30. LA Waterkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 360 East 2nd Street, Suite 250, Los Angeles, California 90012.

31. Founded in 1993, LA Waterkeeper is dedicated to the preservation, protection, and defense of the inland and coastal surface and ground waters of Los Angeles County. LA Waterkeeper's mission is to fight for the health of the region's waterways, and for sustainable, equitable, and climate-friendly water supplies.

32. The organization works to achieve this goal through education, outreach, advocacy, and, where necessary, litigation and enforcement actions under the Clean Water Act on behalf of itself and its members.

33. LA Waterkeeper members live, work, and recreate in and around the Los Angeles basin, and include many who live and/or recreate in and around Sepulveda

Canyon Channel, Ballona Creek, Ballona Creek Estuary, Santa Monica Bay, as well as the beaches and nearshore and coastal waters of the Pacific Ocean between Santa Monica and Huntington Beach (collectively, the "Receiving Waters").

34.     LA Waterkeeper members use and enjoy the Receiving Waters to fish, surf, swim, sail, SCUBA dive, kayak, bird/wildlife watch, bike, run, hike, and walk. LA Waterkeeper members also use the Receiving Waters to engage in education and scientific study through pollution and habitat monitoring and restoration activities.

35.     The Facility's unlawful discharge of pollutants into the Receiving Waters, and failure to comply with the General Permit's non-discharge mandates, harm LA Waterkeeper's members and impair their ability to use and enjoy these waters. The interests of LA Waterkeeper and its members, therefore, have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Act and General Permit.

36.     Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

37.     The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

**B.     Owner and/or Operator of the Facility**

38.     UCLA is a public land-grant research university located in Westwood, Los Angeles, California.

39.     UCLA owns and operates a 437-acre campus, including the Co-Gen Facility at 731 Charles E. Young Dr. South, Los Angeles, CA 90095.

40.     According to the State Water Resources Control Board's ("State Board") online database for NPDES permit compliance filings—the Storm Water Multiple Application and Report Tracking System ("SMARTS")—UCLA first filed a Notice of Intent to enroll the Facility in the General Permit on April 7, 1992 and was assigned the WDID number 4 19I005470.

41.     The Co-Gen Facility and UCLA's transit operations maintenance yard were regulated under the IGP under the same WDID until the transit operations received a No-Exposure Certification ("NEC") on November 19, 2020 and was given a new WDID.

42.     UCLA's most recent Notice of Intent, filed February 2, 2023, lists the Co-Gen Facility operator contact as Curtis Plotkin, Assistant Vice Chancellor of Environment, Health & Safety, at 501 Westwood Plaza, 4th Floor, Box 951605, Los Angeles, CA 90095.

43.     The Facility's primary industrial activities include electric power generation, transmission, and distribution, providing 85% of the electrical power for UCLA's campus.

44.     The Facility also generates chilled water for cooling and steam for heating, transmitted through distribution lines to over 60 campus buildings.

45.     UCLA has classified the Facility's primary industrial activity under Standard Industrial Classification ("SIC") code 4911 (Electric Services).

46.     UCLA has classified the Facility's secondary industrial activity under SIC code 4173 (Terminal and Service Facilities for Motor Vehicle Passenger Transportation), and its tertiary industrial activity under SIC code 8221 (Colleges,

Universities, and Professional Schools).

47.    Storm water discharges from the Facility discharge into Sepulveda Canyon Channel, Ballona Creek, Ballona Creek Estuary, and Santa Monica Bay.

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act

48.    The Act is the primary federal statute regulating the protection of the nation's water. The Act aims to prevent, reduce, and eliminate pollution in the nation's water in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

49.    To accomplish this goal, section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with other enumerated sections of the Act, including prohibition of discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402. *Id.* §§ 1311, 1342(b); *see also* General Permit, § I.A.12.

50.    The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

51.    All unpermitted discharges of polluted storm water "associated with industrial activity" are violations of the Act. 33 U.S.C. § 1342(b)(2)(B).

52.    Categories of facilities considered to be engaging in industrial activity include, without limitation, steam electric power generating facilities, 40 C.F.R. § 122.26(B)(14)(vii), and those defined in Subchapter N, including Part 423 (steam

electric power generating point source category), *id*. §§ 122.26(B)(14)(i), 423.10.

53.    Section 402(p) of the Act establishes a framework regulating industrial storm water discharges under federal and authorized state NPDES permit programs. 33 U.S.C. § 1342(p).

54.    Section 402(b) of the Act allows each state to administer an NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water, approved by the U.S. EPA. *Id*. § 1342(b).

55.    States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers. *Id.*

56.    Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1), (f).

57.    "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; (b) an ELG prescribed in Subchapter N; and/or (c) a condition of an NPDES permit such as the General Permit. *Id.* § 1365(f); *see also id*. §§ 1311(a), 1314(b), 1342.

58.    A "person" under the Act includes individuals, corporations, partnerships, associations, States, municipalities, commissions, and political subdivisions of a State, or any interstate body. *Id.* § 1362(5).

59.    The Act is a strict liability statute. *NRDC v. Los Angeles County,* 725

F.3d 1194, 1204–1205 (9th Cir. 2013); *Baykeeper v. Int'l Metals Ekco, Ltd.*, 619 F. Supp. 2d 936, 940 (C.D. Cal. 2009), *citing Hawaii's Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw. 1993).

60.     Each violation of any term or condition in an NPDES permit is an independent violation of the Act. 33 U.S.C. § 1319(d). Each separate violation of the Act subjects the violator to a penalty of up to $64,618.00 per day per violation for violations occurring after November 2, 2015, where penalties are assessed on or after January 6, 2023. *Id.* §§ 1319(d), 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

61.     Section 505(d) of the Act allows a prevailing or substantially prevailing party to recover litigation costs, including fees for attorneys, experts, and consultants where the court finds that such an award is appropriate. 33 U.S.C. § 1365(d); *see also St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1062–64 (9th Cir. 2009) (holding that the court's discretion to deny a fee award to a prevailing plaintiff is narrow, and denial is "extremely rare.").

### B. California's Storm Water Permit

62.     The State Board is charged with regulating pollutants to protect California's water resources, Cal. Water Code § 13001, and is designated as the state agency for all purposes stated in the CWA, *id.* § 13160(a).

63.     California is authorized by U.S. EPA to issue NPDES permits for storm water discharges associated with industrial activities. U.S. EPA, *NPDES State Program Authority*, https://www.epa.gov/npdes/npdes-state-program-authority (last

updated on Jan. 3, 2023); *see* 33 U.S.C. § 1342(b); 40 C.F.R. § 122.28(a).

64. The relevant NPDES permit in this action is the General Permit, which is issued by the State Board and implemented and enforced by Regional Board Water Quality Control Boards, including the Los Angeles Regional Water Quality Control Board ("Regional Board").

65. In order to discharge storm water lawfully, certain industrial dischargers in California must obtain coverage under the General Permit and comply with all its terms. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1); *see also* General Permit, § I.A.12.

66. Facilities undertaking industrial activities classified under Standard Industrial Classification code 4911 are required to apply for, and obtain coverage under, the General Permit by submitting a Notice of Intent to the State Board. General Permit, § I.A.12; General Permit, Attachment A, § 2.

67. The Notice of Intent serves as certification to the State of California that the industrial facility owner(s), operator(s), and/or agent(s) have read the General Permit and will comply with all its terms and conditions.

68. The General Permit's annual compliance period runs from July 1 of each calendar year to June 30 of the subsequent calendar year ("Reporting Year"), e.g. July 1, 2022 through June 30, 2023.

69. Compliance with the General Permit constitutes compliance with the Clean Water Act for purposes of storm water discharges. 33 U.S.C. § 1311(b)(2)(A), (E).

70. Conversely, "[General] Permit noncompliance constitutes a violation of

the Clean Water Act and the [California] Water Code." General Permit, § XXI.A; *see also* General Permit, § I.A.8 ("This General Permit authorizes discharges of industrial storm water [] so long as those discharges comply with all requirements, provisions, limitations, and prohibitions in this General Permit.").

71.     Permittees that fail to comply with the terms and conditions of the General Permit, therefore, are liable for violations of the Act. *Nw. Envtl. Advocates. v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("[T]he plain language [of the CWA] authorizes citizens to enforce all permit conditions."); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000) (finding that "the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural.").

72.     UCLA is liable for past and ongoing violations of the General Permit, and civil penalties and injunctive relief are available remedies. *See* 33 U.S.C. §§ 1311, 1342.

//

//

**C.     The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

73.     The General Permit contains the following three sections restricting the discharge of pollutants in storm water from the Facility: (1) discharge prohibitions; (2) technology-based effluent limitations; and (3) water quality-based effluent limitations.

        1. Discharge Prohibitions

74.     The General Permit's Discharge Prohibitions include the prohibition of any "discharges of liquids or materials other than storm water" (e.g., vehicle or

building wash water, industrial particulates, water used for dust suppression, chemical spills, trash) not otherwise authorized by another NPDES permit, either directly or indirectly to waters of the United States. General Permit, § III.B.

75.     The General Permit's Discharge Prohibitions also prohibit storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code. General Permit, § III.C.

76.     The General Permit's Discharge Prohibitions further prohibit discharges that violate any discharge prohibitions contained in any applicable Regional Water Board Water Quality Control Plans, or any statewide water quality control plans and policies. General Permit, § III.D.

2.   Technology-Based Effluent Limitations

77.     The General Permit contains technology-based effluent limitations that set the floor for pollution reduction, i.e., the minimum level of pollution reduction that must be achieved by all permittees, regardless of the quality of water to which a permittee facility discharges. General Permit, § V; *see also* General Permit, Fact Sheet § II.D.31 ("[Clean Water Act] Section 301(b)(1)(A) requires that discharges from existing facilities must, *at a minimum*, comply with technology-based effluent limitations based on the technological capability of Dischargers to control pollutants in their discharges." (emphasis added)).

78.     The General Permit's technology-based effluent limitations require permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of pollution controls that achieve the Best Available Technology

Economically Achievable ("BAT") in the industry for toxic or non-conventional pollutants, and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. General Permit, § V.A, Fact Sheet § II.D.5; *see* 40 C.F.R. §§ 401.15–.16 (listing conventional and toxic/non-conventional pollutants).

79. Compliance with the General Permit's technology-based effluent limitations requires permittees to design and implement effective, site-specific pollution control strategies called Best Management Practices ("BMPs") that prevent or reduce storm water discharges consistent with BAT/BCT pollution reduction industry standards. General Permit, § V.A; General Permit, Fact Sheet § II.D.5 ("Dischargers must implement BMPs that meet or exceed the BAT/BCT technology-based standard.").

80. Best Management Practices are schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the United States. Best Management Practices include treatment systems, operation procedures, and processes to control and abate the discharge of pollutants from the Facility. 40 C.F.R. § 122.2.

81. Permittees must design Best Management Practices that meet the BCT standard for all sources of conventional pollutants, including total suspended solids, oil and grease, and pH. General Permit, Fact Sheet § I.B; 33 U.S.C. § 1311(b)(1)(A); *see* 40 C.F.R. § 401.16 (listing conventional pollutants).

82. Permittees must thereafter implement and maintain, as well as evaluate and improve, their Best Management Practices to ensure that the concentration of conventional pollutants in any storm water discharge is controlled consistent with the

1 BCT standard. General Permit, Fact Sheet § II.D.5.

2     83.    Permittees must design Best Management Practices that meet the BAT

3 standard for all sources of toxic pollutants. General Permit, Fact Sheet § I.B; 33

4 U.S.C. § 1311(b)(2)(A); *see* 40 C.F.R. § 401.15 (listing toxic pollutants).

5     84.    Permittees must implement and maintain, as well as evaluate and

6 improve, those Best Management Practices to ensure that the concentration of any

7 toxic pollutant in any storm water discharge is reduced consistent with the BAT

8 standard. General Permit, Fact Sheet § II.D.5.

9     85.    Multiple pollutants discharged and/or emitted, or potentially

10 discharged/emitted, from the Facility are classified as toxic pollutants pursuant section

11 307(a)(1) of the Act including, without limitation, arsenic, chlorinated solvents, and

12 heavy metals. *See* 40 C.F.R. § 401.15.

13     86.    The 2008, 2015, and 2021 versions of U.S. EPA's NPDES Storm Water

14 Multi-Sector General Permit for Industrial Activities include numeric standards called

15 benchmark pollutant concentrations for industrial storm water discharges ("U.S. EPA

16 Benchmarks"). U.S. EPA, National Pollutant Discharge Elimination System (NPDES)

17 Multi-Sector General Permit (MSGP) for Storm Water Discharges Associated with

18 Industrial Activity § 4.2.2 (as modified Mar. 1, 2021).

19     87.    U.S. EPA Benchmarks are objective numeric standards for evaluating

20 whether the Best Management Practices designed and implemented at a facility

21 achieve the statutory BAT/BCT standard. *See* 80 Fed. Reg. 34403, 34405 (June 16,

22 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746,

23 64766–64767 (Oct. 30, 2000).

88.     Discharges of storm water containing pollutant concentrations exceeding U.S. EPA Benchmarks evidence a failure to develop and implement pollution control strategies that achieve BAT/BCT-level pollutant reductions. *See Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 921–25 (C.D. Cal. 2009); *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

89.     Table 2 contains some of U.S. EPA Benchmarks relevant to the assessing the Facility's compliance with the BAT/BCT standard.

**TABLE 2**
U.S. EPA Benchmarks Applicable to the Facility's Discharges

| POLLUTANT | 2015 BENCHMARK | 2021 BENCHMARK |
|---|---|---|
| copper | 0.014 mg/L[1] | 0.00519 mg/L |
| lead | 0.082 mg/L | 0.082 mg/L |
| zinc | 0.12 mg/L | 0.12 mg/L |
| iron | 1.0 mg/L | n/a |
| pH | 6.0–9.0 s.u. | 6.0–9.0 s.u. |
| TSS | 100 mg/L | 100 mg/L |

90.     Records of visual observations required to be maintained by the General Permit are relevant to assessing a permittee's compliance with the BAT/BCT standard.

91.     Best practices within an industrial category, and/or implemented at similar industrial facilities, are relevant measures for evaluating whether a permittee's Best Management Practices comply with the BAT/BCT standard.

3.     Water Quality-Based Effluent Limitations

92.     In addition to complying with the General Permit's technology-based

---

[1] mg/L = milligrams per liter.

effluent limitations, permittees are required to meet "any more stringent [water quality-based limitations] necessary for receiving waters to meet applicable water quality standards." General Permit, § I.D.31; *see also* 33 U.S.C. § 1311(b)(1)(C).

93.     Unlike the General Permit's technology-based effluent limitations, compliance with water quality-based effluent limitations (a.k.a., "Receiving Water Limitations") depends on the status of surface waters receiving a given facility's storm water discharge.

94.     Receiving Water Limitations are intended to protect designated beneficial uses of surface waters to which a facility discharges storm water. General Permit, § VI.A.

95.     Beneficial uses of the Receiving Waters are defined in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties* ("Basin Plan"), promulgated by the California Regional Water Quality Control Board, Los Angeles Region 4 and most recently amended February 13, 2020.

96.     Existing and potential designated beneficial uses of the Sepulveda Canyon Channel, Ballona Creek, Ballona Creek Estuary, and Santa Monica Bay include: Municipal and Domestic Supply, Navigation, Commercial and Sport Fishing, Estuarine Habitat, Wetland Habitat, Water Contact Recreation, Non-Contact Water Recreation, Rare, Threatened, or Endangered Species, Wildlife Habitat, and Warm Freshwater Habitat. Basin Plan, Table 2-3, 2-3(a).

97.     In California law, "water quality objectives" are the numeric or narrative water quality levels established for the "reasonable protection of the beneficial uses

1   and the prevention of nuisance." Cal. Water Code §13050(h).

2      98.    Under federal law, the combination of a designated beneficial use and the

3   water quality objective (or criterion) set to protect the use results in what is referred to

4   as a "water quality standard." 40 C.F.R. §131.2 and §131.3(i).

5      99.    Surface waters that cannot support designated beneficial uses (as listed in

6   the Basin Plan) due to instream exceedances of a water quality standard are

7   designated as impaired water bodies pursuant to section 303(d) of the Clean Water

8   Act and placed on the "303(d) List." *See* 33 U.S.C. § 1313(d).

9      100.   According to the State Board's 2020–2022 Integrated 303(d) List of

10  Impaired Water Bodies, the Sepulveda Canyon Channel is impaired for copper,

11  indicator bacteria, lead, selenium, and zinc.

12     101.   According to the State Board's 2020–2022 Integrated 303(d) List of

13  Impaired Water Bodies, Ballona Creek is impaired for copper, cyanide, indicator

14  bacteria, lead, toxicity, trash, viruses (enteric), and zinc.

15     102.   According to the State Board's Recommended 2024 Integrated 303(d)

16  List of Impaired Waters, Ballona Creek's proposed additional listings include

17  aluminum, bifenthrin, chlordane, cyfluthrin, cyhalothrin (lambda), cypermethrin,

18  DDT (dichlorodiphenyltrichloroethane), deltamethrin, esfenvalerate/fenvalerate,

19  fipronil, imidacloprid, permethrin, pyrethroids, and pH.

20     103.   According to the State Board's 2020–2022 Integrated 303(d) List of

21  Impaired Water Bodies, Ballona Creek Estuary is impaired for cadmium, chlordane,

22  copper, DDT (dichlorodiphenyltrichloroethane), indicator bacteria, lead, PAHs

23  (polycyclic aromatic hydrocarbons), PCBs (polychlorinated biphenyls), silver,

toxicity, and zinc.

104. According to the State Board's Recommended Integrated 2024 303(d) List of Impaired Waters, Ballona Creek Estuary's proposed additional listings include DDE (dichlorodiphenyldichloroethylene).

105. According to the State Board's 2020–2022 Integrated 303(d) List of Impaired Water Bodies, Santa Monica Bay is impaired for arsenic, DDT (dichlorodiphenyltrichloroethane), mercury, PCBs (polychlorinated biphenyls), and trash.

106. Once placed on the 303(d) List, the CWA requires the U.S. EPA or the state to prepare a total daily maximum load ("TMDL") designed to restore the water quality in a water body (or segment) to support designated beneficial uses. 33 U.S.C. § 1313.

107. The General Permit must contain "effluent limits [that] are consistent with the assumptions and requirements of any available wasteload allocation for the discharge." 40 C.F.R. § 122.44(d)(1)(vii)(B).

108. A TMDL specifies the maximum amount of a pollutant that a waterbody (or segment) can receive and still meet water quality standards, and then allocates pollutant loadings to point and non-point sources, as waste load allocations ("WLAs") and load allocations ("LAs") respectively.

109. On December 5, 2013, the LA Regional Board approved an Amendment to the Basin Plan to incorporate the Ballona Creek Metals Total Maximum Daily Load ("Ballona Creek Metals TMDL") and the Ballona Creek Estuary Toxics Total Maximum Daily Load ("Ballona Creek Estuary Toxics TMDL").

110. These TMDLs assigns WLAs to "Responsible Parties," which include "Individual and General Stormwater Permit Enrollees," e.g., industrial facilities subject to the General Permit.

111. The UCLA Co-Gen Facility is an enrollee in the General Permit.

112. In 2018, the State Board re-opened the General Permit "to amend Attachment E [and] the Fact Sheet [to incorporate enforceable] TMDL-specific [] requirements," including Numeric Effluent Limitations ("NELs") set in the Ballona Creek Metals TMDL. General Permit § I.F.42; *see also* General Permit Fact Sheet § II.F.6.h.xi.

113. The Ballona Creek Metals TMDL-based instantaneous maximum NEL values for copper, lead, and zinc apply to storm water discharges from the Facility.

114. The instantaneous maximum NEL values for copper, lead, and zinc in the Ballona Creek or Sepulveda Canyon Channel became effective on July 1, 2020. General Permit, Attachment E.

115. Table 3 includes the instantaneous maximum NEL values for copper, lead, and zinc as contained in the General Permit. General Permit, Attachment E.

**TABLE 3**
NUMERIC EFFLUENT LIMITATION VALUES APPLICABLE TO THE FACILITY'S DISCHARGES

| PARAMETER | NEL |
|---|---|
| copper (total) | 0.0137 mg/L |
| lead (total) | 0.07675 mg/L |
| zinc (total) | 0.10477 mg/L |

116. Any exceedance of the instantaneous maximum NELs in Table 3 after July 1, 2020 is a violation of the General Permit and the Act. General Permit, § V.C.1;

*see also* General Permit, Attachment E.

117. An instantaneous maximum NEL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a Reporting Year exceeds the instantaneous maximum NEL value for that parameter. General Permit, Attachment C at 5.

118. The General Permit contains three Receiving Water Limitations. General Permit, § VI.A–C.

119. The first Receiving Water Limitation prohibits discharges of storm water associated with industrial activity that causes or contributes to an exceedance of any applicable water quality standards ("WQSs"). General Permit, § VI.A; *see also Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166–1167 (9th Cir. 1999) (holding that industrial storm water discharges must strictly comply with water quality standards).

120. Water quality standards applicable to the Receiving Waters include without limitation:

(1) the numeric aquatic life and human health criteria set out in the California Toxics Rule ("CTR"), 40 C.F.R. 131.38, *see also* 65 Fed. Reg. 31712 (May 18, 2000), which apply to the Receiving Waters except for impairments/pollutants being addressed by a TMDL or similar instrument (e.g., Site Specific Objectives);

(2) all numeric objectives contained in the Basin Plan or subsequent amendments;

(3) all narrative objectives contained in the Basin Plan or subsequent amendments (e.g., "[a]ll waters shall be maintained free of toxic substances in

concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life." Basin Plan at 3-38).

121. Storm water discharges with pollutant concentrations that cause or contribute to an exceedance of any applicable water quality standards are violations of the General Permit and the Act.

122. The Basin Plan and California Toxics Rule set applicable water quality standards for storm water discharges from the Facility containing pollutants not addressed by the Ballona Creek Metals TMDL including, without limitation, arsenic and chlorinated solvents.

123. The California Toxics Rule sets numeric criteria for 23 priority toxic pollutants to protect aquatic life and for 57 priority toxic pollutants to protect human health based on the U.S. EPA Administrator's determination that such numeric criteria are necessary in the State of California to protect human health and the environment. 65 FR 31681 (May 18, 2000); *see also* 40 C.F.R. § 131.2 ("Such standards [] serve as the regulatory basis for the establishment of water quality-based treatment controls and strategies beyond the technology-based levels of treatment required by sections 301(b) and 306 of the Act."

124. The General Permit's second water quality-based effluent limitation is that pollutant concentrations in storm water discharges shall "not adversely impact human health or the environment." General Permit, § VI.B.

125. Storm water discharges with pollutant concentrations that adversely impact human health or the environment are violations of the General Permit and the Act.

126.    The General Permit's third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. General Permit, § VI.C.

127.    Storm water discharges with pollutant concentrations that threaten to cause pollution or a public nuisance are violations of the General Permit and the Act.

128.    Polluted storm water and non-storm water discharges from the Facility harm use and enjoyment of the Receiving Waters for recreational, aesthetic, spiritual, and other activities by LA Waterkeeper members and the public.

129.    Permittees are required to complete Water Quality Based Corrective Actions when industrial storm water discharges contain pollutant concentrations that violate Receiving Water Limitations. General Permit, § XX.B.

130.    Water Quality Based Corrective Actions include without limitation:

(1) an evaluation of pollutant sources and Best Management Practices implementation;

(2) assessment of whether additional measures are necessary to reduce or prevent pollutant discharge; and

(3) certification that all additional measures necessary to meet Receiving Water Limitations have been identified and included in the facility's Pollution Prevention Plan. *See* General Permit, § XX.B.1.a–c.

131.    Failure to comply with Water Quality Based Corrective Action requirements is an independent violation of this General Permit. General Permit, Fact Sheet II.E.1.

132.    Compliance with the General Permit's Water Quality Based Corrective

Actions is an independent mandate, and does not excuse or otherwise impact a permittee's liability for the underlying violations of the Receiving Water Limitations.

### C. Storm Water Pollution Prevention Plan Requirements

133. The General Permit requires permittee facilities to develop and implement a Storm Water Pollution Prevention Plan ("Pollution Prevention Plan") prior to conducting, and in order to lawfully continue, industrial activities. General Permit, §§ I.I.54, X.B.

134. "Failure to develop or implement an adequate [Pollution Prevention Plan], or update or revise an existing [Pollution Prevention Plan] as required, is a violation of this General Permit." General Permit, Fact Sheet § II.I.1.

135. The objectives of Pollution Prevention Plans are: (1) to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and non-storm water discharges; and (2) to describe and detail site-specific Best Management Practices to reduce or prevent pollutant concentrations in storm water discharges to levels that comply with the General Permit's technology-based and water quality-based effluent limitations. General Permit, § X.C.

136. Each Pollution Prevention Plan must include the following elements, among others:

(1) a narrative description and assessment of all industrial activities, potential sources of pollution, and pollutants associated with each potential source;

(2) identification and location where materials are being shipped, received, stored, and handled, as well as the typical quantities of such materials and the frequency with which they are handled;

(3) a description of dust and particulate generating activities;

(4) a site map including all areas of industrial activity subject to the General Permit that depicts the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, pollutant control measures, and municipal storm drain inlets that may receive the facility's discharge;

(5) a detailed description of the Best Management Practices developed and implemented, as well as a justification for Best Management Practices that are not being implemented;

(6) identification of areas of the Facility where the minimum Best Management Practices do not adequately reduce or prevent pollutants in storm water discharges and advanced Best Management Practices to be implemented in those areas;

(7) identification of unauthorized non-stormwater discharges; and

(8) identification of persons and their current responsibilities for developing and implementing the Pollution Prevention Plan.

137. Each of the industrial processes and all industrial activities undertaken at the Facility are pollutant sources that must be described and assessed in each Pollution Prevention Plan for their potential contribution of pollutants in storm water discharges. General Permit, §§ X.C, X.F, X.G.

138. Pollution Prevention Plans must be evaluated and revised as necessary, and on at least an annual basis, to ensure ongoing compliance. General Permit, § X.B. Evaluation of the Pollution Prevention Plans requires a review of all visual

observation records, inspection reports, sampling and analysis results, a visual

inspection of all potential pollutant sources for evidence of, or the potential for,

pollutants entering the drainage system, a review and evaluation of all BMPs to

determine whether the BMPs are adequate, properly implemented, and maintained, or

whether additional BMPs are needed. General Permit, §§ X.A, XV.

139.   UCLA's failure to develop, implement, or revise a comprehensive

Pollution Prevention Plan for its Co-Gen Facility that contains all required elements is

a violation of the General Permit, and establishes liability under the Act. General

Permit, § X.B; *see also* General Permit, Factsheet § II.I.1.

## D.   The General Permit's Monitoring and Reporting Requirements

140.    All NPDES permits shall contain water quality monitoring requirements

sufficient to assure compliance with permit technology-based and water quality-based

effluent limitations. *See* 33 U.S.C. § 1342(a)(2); 40 C.F.R. § 122.44(i)(1) ("[E]ach

NPDES permit shall include . . . monitoring requirements . . . to assure compliance

with permit limitations.").

141.   Permittees must develop a written plan containing the permittee facility's

monitoring and reporting program ("Monitoring Implementation Plan") to be included

in the Pollution Prevention Plan prior to conducting, and in order to lawfully continue,

industrial activities. General Permit, §§ X.I, XI.

142.   The objective of the Monitoring Implementation Plan is to detect and

measure concentrations of pollutants in a facility's storm water discharges to assess

compliance with the General Permit's substantive requirements, including the

technology-based and water quality-based effluent limitations. General Permit,

Factsheet § II.J.1.

143.   Information derived from the Monitoring Implementation Plan informs each permittee as to whether it must adapt Best Management Practice design and/or implementation to ensure that storm water and non-storm water discharges comply with the General Permit. General Permit, §§ X.I, XI.

144.   The Monitoring Implementation Plan is an essential component in the General Permit's mandatory iterative self-evaluation process whereby permittees must implement Best Management Practices contained in the Pollution Prevention Plan, evaluate Best Management Practice effectiveness using visual observation and storm water sampling data, and then revise Best Management Practices as necessary to consistently comply with the General Permit's technology-based and water quality-based effluent limitations. *See* 33 U.S.C. § 1342(a)(2).

145.   Permittees that fail to develop and implement an adequate Monitoring Implementation Plan that includes both visual observations and sampling and analysis are in violation of the General Permit. General Permit, § II.J.3.

146.   The CWA requires the collection and analysis of storm water discharge samples sufficient to determine compliance with all permit limits. General Permit, § XI.B; *NRDC v. County of L.A.*, 725 F.3d 1194, 1208 (9th Cir. 2013) ("[T]he Clean Water Act *requires* every NPDES permittee to monitor its discharges into the navigable waters of the United States in a manner sufficient to determine whether it is in compliance with the relevant NPDES permit." (emphasis in original)).

147.   The General Permit requires permittees to collect storm water samples from each location where storm water is discharged from its facility. General Permit,

1  §§ XI.B.4–5.

2      148.   The General Permit requires permittees to collect and analyze storm

3  water samples from two Qualifying Storm Events ("QSEs") between July 1 and

4  December 31 of each reporting year and two (2) Qualifying Storm Events between

5  January 1 and June 30 of each reporting year. General Permit, § XI.B.2.

6      149.   A Qualifying Storm Event is a precipitation event that: (a) produces a

7  discharge from at least one drainage area at the permittee facility; and (b) is preceded

8  by forty-eight (48) hours with no discharge from any drainage area. General Permit, §

9  XI.B.1.

10     150.   Each sample must be collected within four (4) hours of the start of a

11 discharge, or the start of facility operations if the Qualifying Storm Event occurs

12 within the 12-hour period prior to business hours. General Permit, § XI.B.5.

13     151.   The General Permit requires permittees to analyze samples for, among

14 other parameters:

15         (1) conventional pollutants (pH, total suspended solids, and either total

16 organic carbon or oil and grease) (§ XI.B.6.a–b);

17         (2) facility-specific pollutants identified in the pollutant source

18 description and evaluation process including (§ XI.B.6.c);

19         (3) Standard Industrial Classification code-based parameters listed in the

20 General Permit at Table 1 (§ XI.B.6.d);

21         (4) parameters related to receiving waters with 303(d) listed impairments,

22 or approved Total Maximum Daily Loads including, without limitation, copper, zinc,

23 and lead for Sepulveda Channel and Ballona Creek, and cadmium, PAHs, arsenic, and

mercury for Ballona Creek Estuary and Santa Monica Bay (§ XI.B.6.e); and

(5) Regional Board-mandated parameters, which are any additional pollutants identified by the relevant Regional Board (§ XI.B.6.f).

152.   The General Permit requires permittees to submit all sampling and analytical results for every sample via the State Board's online reporting system within thirty (30) days of obtaining each analytical report from a certified laboratory. General Permit, § XI.B.11.a.

153.   Permittees must also conduct visual observations at least once a month, and at the same time sampling occurs at each discharge location. General Permit, § XI.A.

154.   Records of visual observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, or odor, and identify the source of any pollutants. General Permit, § XI.A.2.

155.   Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants observed in storm water discharges. General Permit, § XI.A.3.

**E.     Numeric Action Levels and Exceedance Response Actions**

156.   The General Permit requires permittees to take corrective action in response to monitoring data that demonstrates that pollutant concentrations in storm water discharged from its facility exceed Numeric Action Levels ("NALs"). General Permit, § XII.

157.   Annual Numeric Action Levels are similar to, and derive from, U.S. EPA Benchmarks. General Permit, Fact Sheet, § I.D. Some of the annual Numeric Action

Levels applicable to the Facility are summarized in Table 4.

**TABLE 4**
NUMERIC ACTION LEVELS APPLICABLE TO THE FACILITY'S DISCHARGES

| POLLUTANT | 2018 NAL |
|---|---|
| TSS | 100 mg/L |
| copper | 0.0332 mg/L |
| lead | 0.262 mg/L |
| zinc | 0.26 mg/L |
| N+N | 0.68 mg/L |
| iron | 1.0 mg/L |

158. A Numeric Action Levels exceedance occurs when the average of all sampling data for a given pollutant from a reporting year exceeds the Numeric Action Level assigned to that pollutant, i.e. if the average concentration from three samples of zinc is 0.52 mg/L (e.g., 0.26 mg/L, 0.52 mg/L, and 0.78 mg/L). General Permit, § XII.A.1.

159. Numeric Action Level exceedances operate as a signal to owners/operators, state agencies, and the public that a permittee's Best Management Practices are patently deficient, and therefore immediate remedial actions are required. General Permit, § XII.A.

160. However, the Numeric Action Levels "are not intended to serve as technology-based or water quality-based numeric effluent limitations. The [Numeric Action Levels] are not derived directly from either BAT/BCT requirements or receiving water objectives. [Numeric Action Levels] exceedances defined in this General Permit are not, in and of themselves, violations of this General Permit." General Permit, § I.N.77.

161. The General Permit requires a permittee with Numeric Action Level exceedance(s) to develop and implement Exceedance Response Action ("ERA") procedures. General Permit, § XII.

162. The first time a permittee's storm water sampling data demonstrates an exceedance of a Numeric Action Level, its compliance status changes from Baseline to Level 1 on July 1 following the reporting year during which the exceedance(s) occurred. General Permit, § XII.C.

163. At Level 1 status, a permittee must: evaluate and revise, as necessary, its Best Management Practices with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP") by October 1; and submit an Exceedance Action Report prepared by the Qualified Industrial Stormwater Practitioner by January 1. General Permit, § XII.C.

164. A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 Exceedance Response Action report has been completed, all identified additional Best Management Practices have been implemented, and results from four (4) consecutive subsequent qualified storm events sampled indicate no additional NAL exceedances for that parameter. General Permit, § XII.C.2.b.

165. A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a Numeric Action Level exceedance for that same parameter while the Discharger is in Level 1. Level 2 status will commence on July 1 following the reporting year during which the additional Numeric Action Level exceedance(s) occurred. General Permit, § XII.D.

166. Dischargers with Level 2 status must certify and submit a Level 2

Exceedance Response Action Plan prepared by a Qualified Industrial Stormwater Practitioner that addresses each new Level 2 Numeric Action Level exceedance by January 1 following the year Level 2 status is assigned. General Permit, § XII.D.1.a.

167.   All elements of the Level 2 Exceedance Response Action Plan must be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 Exceedance Response Action Plan. General Permit, § XII.D.1.d.

168.   On January 1 of the year following the submittal of the Level 2 Exceedance Response Action Plan, the discharger with Level 2 status must certify and submit a Level 2 Exceedance Response Action Technical Report prepared by a Qualified Industrial Stormwater Practitioner. General Permit, § XII.D.2.

169.   A discharger's failure to comply with mandatory corrective action process triggered by entering Level 1 or Level 2 status is a violation of the General Permit and the Act. General Permit, § I.N.76, Fact Sheet § K.2.b ("[I]t is a violation of the permit [] to fail to comply with the Level 1 status and Level 2 status ERA requirements in the event of [] exceedances.")

170.   However, compliance with the Exceedance Response Action requirements does not shield a permittee from liability for violations of the General Permit's technology-based or water quality-based mandates, and does not excuse past or ongoing violations of the General Permit's pollution prevention mandates.

**F. The General Plan's Annual Comprehensive Facility Compliance Evaluation Requirement**

171.   Permittees must complete an Annual Comprehensive Facility

Compliance Evaluation ("Annual Compliance Evaluation") each reporting year. General Permit, § XV. The goal of the Annual Compliance Evaluation is to ensure and certify compliance with each of the General Permit's other mandates.

172.   The Annual Compliance Evaluation must include, at a minimum:

(1) a review of all sampling, visual observation, and inspection records conducted during the previous year;

(2) an inspection of all areas of industrial activity and associated pollutant sources for evidence of pollutants entering the storm water conveyance system;

(3) an inspection of all drainage areas previously identified as having no exposure to industrial activities;

(4) an inspection of equipment needed to implement Best Management Practices;

(5) an inspection and evaluation of all Best Management Practices for proper design, implementation, and adequate reduction/prevention of pollutants in storm water discharges;

(6) a determination of whether additional Best Management Practices are needed to comply with the General Permit; and

(7) an assessment of any other factors needed to comply with the requirements of Section XVI.B (Annual Report mandates). General Permit, § XVI.

173.   The General Permit requires permittees to submit a Compliance Checklist with each Annual Report that contains the following:

(1) an indication of whether the permittee complies with, and has

addressed all applicable requirements of, the General Permit;

(2) an explanation for any noncompliance with requirements within the Reporting Year, as indicated in the Compliance Checklist;

(3) an identification, including page numbers and/or sections, of all revisions made to the Pollution Prevention Plan within the Reporting Year; and

(4) the date(s) of the annual Compliance Evaluation.

174. Any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall, upon conviction, be punished by a fine of not more than $10,000.00 or by imprisonment for not more than two years or by both. General Permit, § XXI.N.

## V. **STATEMENT OF FACTS**

### A. The Facility

175. UCLA is a "person" pursuant to the Act. *See* 33 U.S.C. § 1362(5).

176. UCLA is the legally responsible operator of the Co-Gen Facility.

177. UCLA first enrolled the Co-Gen Facility, officially named the Energy Systems Facility, in the General Permit on April 7, 1992.

178. UCLA lists the Co-Gen Facility address as 731 Charles E. Young Drive South in Los Angeles, California in documents submitted to the Regional and State Boards, including its most recent SWPPP, filed on SMARTS in December 2020, and Annual Report, filed on SMARTS in August 2023.

179. UCLA's permit registration documents state that the Facility operates 24

hours per day, 7 days per week.

180. The Facility is approximately 1.6 acres.

181. The Facility is 100% impervious.

182. The Co-Gen Facility is a restricted access, multi-story power generation facility.

183. Operations at the Facility consist of all activities required to produce electricity, steam, and chilled water for heating and cooling to the UCLA campus.

184. Generation of electricity at the Facility uses gas in conjunction with a thermal cycle employing the steam water system as the thermodynamic medium.

185. The Facility produces eighty five percent (85%) of the electrical power at UCLA's campus.

186. Once the electricity leaves the four walls of the plant, electricity is supplied to campus spaces through a network of over 275 large electrical transformers (one transformer can power the equivalent of 3 residential city blocks).

187. The Facility also produces chilled water for cooling and steam for heating. The chilled water is distributed to over 60 campus buildings through a network of 12 miles of chilled water distribution lines and 8 miles of high-pressure steam distribution lines.

188. UCLA's most recent Storm Water Pollution Prevention Plan ("Pollution Prevention Plan" or "SWPPP"), from December 2020, states, "Co-Gen is an enclosed power generation facility with the exception of some equipment located on the roof of the building. . . . The [1.05 acre] roof represents the only area of exposure to storm water. The Co-Gen roof has a very flat grade with several roof drains equally

distributed around the perimeter. . . . The three cooling towers are maintained within bermed areas. There is a fourth bermed area on the roof that is currently not in use. . . . The roof penthouse level is mostly open (0.55 acres) and for the purposes of this SWPPP is considered non-industrial."

189.   Exposed equipment at the Facility includes cooling towers, a waste heat exhaust boiler, a urea system used to manage NOx, and an emergency generator (800 gallon diesel painted steel double-wall Pryco model tank, rectangular tank serves as secondary containment).

190.   According to the 2020 SWPPP, the Facility's "penthouse roof level" contains "limited infrastructure," including "heating, ventilation and air-conditioning (HVAC) infrastructure, cell tower infrastructure (operated by AT&T, non-jurisdictional equipment), and site access infrastructure (stair wells, elevator shaft, etc.). The penthouse roof is plumbed to the main roof drains and cannot be hydraulically isolated."

191.   Storm water flows containing pollutants originating from areas at the Facility where UCLA conducts industrial activities are discharged from at least one discharge point to the "Receiving Waters."

192.   Sepulveda Channel, Ballona Creek, Ballona Creek Estuary, and Santa Monica Bay are waters of the United States.

193.   The Pacific Ocean is a water of the United States.

194.   Each industrial process undertaken by UCLA at the Co-Gen Facility, including without limitation those industrial activities described in paragraphs 185 to 192, has the potential to generate pollutants that will contaminate its storm water

discharges, which flow directly and indirectly into the Receiving Waters.

195. The Facility's sampling data establishes that storm water discharges into the Receiving Waters contain copper, lead, zinc, iron, TSS, and pH, among other pollutants. See EXHIBIT 1-Appendix 1 (comparing UCLA's sampling data analyses to U.S. EPA Benchmark pollution limits).

196. Polluted storm water discharges from SIC code 4911 (Electrical Services), such as those conducted at the Facility, can also contain pH affecting substances, fuel, oil and grease, heavy metals, ammonia, chloride, sodium hydroxide, chlorinated solvents, ethylene glycol, arsenic, organics, PFAS, among other pollutants. *See* U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector O: Steam Electric Power Generating Facilities, Coal Handling Areas* 2–3 (Feb. 2021), https://www.epa.gov/ sites/default/files/2015-10/documents/sector_o_steamelectricpower.pdf.

197. Phosphorus, suspended solids, and hydraulic fluids are pollutants associated with industrial activities conducted at the Facility.

198. On information and belief, iron, copper, zinc, lead, fuels, TSS, and compounds affecting pH levels are discharged with storm water to the Receiving Waters from the Facility.

199. UCLA has an active Title V permit issued by the South Coast Air Quality Management District covering 99 permitted pieces of equipment related to emissions-generating industrial activities and the operation of emissions control devices at the Co-Gen Facility.

200. Particles emitted into the air as a result of industrial activities at the Facility settle onto exposed surfaces at the Facility and are discharged to the

Receiving Waters by rainwater during storm events.

201. In 2021, UCLA reported to the South Coast Air Quality Management District that the Facility emitted 11.947 tons of carbon monoxide, 31.093 tons of nitrogen oxides, 18.352 tons of particulate matter, 16.861 tons of volatile organic compounds, and 18.980 tons of ammonia.

202. In 2021, UCLA reported that the Facility also emitted 1,3-butadiene, acetaldehyde, acrolein, ammonia, arsenic, asbestos, benzene, cadmium, chlorine, chloroform, chromium (VI), copper, ethyl benzene, ethylene dichloride, ethylene oxide, formaldehyde, hexane, hydrazine, hydrochloric acid, lead (inorganic), manganese, mercury, naphthalene, nickel, PAHs, phosphorous trichloride, propylene oxide, selenium, sulfuric acide, sulfur oxides, toluene, and xylenes.

203. On information and belief, UCLA has not sampled for any pollutants reported emitted from the Facility with the exception of copper and lead.

**B. The 2021 Time Schedule Order**

204. On February 18, 2021, the Regional Board issued UCLA Time Schedule Order No. R4-2021-0004 ("2021 TSO") under the authority of California Water Code Sections 13300 and 13385.

205. The TSO states that:

> The Facility is expected to exceed NELs for total zinc and total copper based on historical monitoring data reported to the State's [SMARTS] database[.] The NELs and corresponding concentrations of these pollutants in the discharge from the Facility have been reported to be:

| Pollutant | Reported Concentration Range in mg/L | Numeric Effluent Limit in mg/L |
|---|---|---|

| Total zinc | 0.52–2.56 | 0.10477 |
| Total copper | 0.0320–0.2 | 0.0137 |

2021 TSO, ¶ 7.

206. The 2021 TSO requires UCLA to implement additional storm water pollution controls by January 31, 2022. Specifically, by such date, the 2021 TSO requires UCLA to implement a capture and reuse project, designed to eliminate storm water discharges from the Co-Gen Facility up to the 95th percentile, 24-hour storm event. 2021 TSO, ¶ 11.

207. UCLA failed to meet the project deadlines set in the 2021 TSO.

208. On May 28, 2021, UCLA proposed to the Regional Board a new implementation date of September 1, 2022 and that the design storm for the capture and reuse project should be reduced to the 85th percentile storm event.

209. Then, on November 12, 2021, UCLA proposed another new implementation date of April 1, 2023.

210. On December 11, 2021, the Regional Board amended the 2021 TSO. The amendment extended the implementation deadline for the capture and reuse project to September 1, 2022, and reduced the design storm for the capture and reuse project to the 85th percentile storm event.

211. UCLA once again did not meet the project deadlines set by the amended 2021 TSO.

212. On May 31, 2022, UCLA proposed to the Regional Board a new implementation date of June 1, 2023.

213. On November 21, 2022, UCLA proposed a new project implementation date of March 1, 2024.

214.  On June 2, 2023, UCLA proposed a new project implementation date of September 1, 2024.

215.  However, on June 13, 2023, the Regional Board posted a proposed second amended TSO for comment, in which the Regional Board proposes extended the implementation deadline only to March 1, 2024—the date proposed by UCLA in its November 2022 update—a date that UCLA has already acknowledged it cannot meet.

216.  Then, in its ERA Level 2 Annual Report uploaded to SMARTS on August 8, 2023, UCLA stated that the project would not be implemented until July 1, 2025, which will be 41 months beyond its original proposed implementation date.

217.  In sum, UCLA has failed to comply with the 2021 TSO, even as amended, has failed to address its polluted storm water discharges from the Co-Gen Facility, and continues to violate the General Permit.

218.  The 2021 TSO does not preclude citizen enforcement for violations of the General Permit and the CWA.

219.  Publicly available documents indicate that the Regional Board proposed a $3,000.00 settlement (R4-2022-0279) for UCLA's failure to submit sampling and analysis required by the General Permit, but do not indicate if the proposed settlement was accepted, or paid, by UCLA.

**C. Stormwater Pollution Prevention Plans**

220.   Publicly available Pollution Prevention Plans from 2015, 2016, 2017, 2018, and 2020 demonstrate that UCLA has failed, and continues to fail, to develop, implement, and/or revise a legally adequate Pollution Prevention Plan.

221. Patently deficient areas of each of UCLA's Pollution Prevention Plans include, without limitation:

(1) Site maps with all required elements, including but not limited to clearly identifying the locations where materials may be directly exposed to precipitation and the locations of dust/particulate generating activities (*see* General Permit, §§ X.A.2, X.E.3);

(2) Descriptions or narrative assessments of potential pollution sources, including but not limited to dust and particulate generating sources (§ X.G);

(3) Descriptions, evaluations, justifications, and revisions of Best Management Practices to ensure compliance with BAT/BCT standards (§ X.H.4.a–b);

(4) Monitoring Implementation Plan prompting analysis of storm water samples for all parameters potentially present in storm water discharges. (§ XI.B.6).

222. Every day the Facility operates with an inadequately developed, implemented, and/or properly revised Pollution Prevention Plans is a separate and distinct violation of the General Permit and Act.

223. These violations are ongoing, and LA Waterkeeper will include additional violations as information becomes available.

**D. Monitoring Implementation Plans**

224. UCLA has conducted and continues to conduct industrial activities at the Facility without developing, implementing, or revising a Monitoring Implementation Plan that complies with the General Permit's requirements.

225. UCLA personnel did not conduct visual observations of all areas of

industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2018–2019 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

226. UCLA personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2019–2020 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

227. UCLA personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2020–2021 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

228. UCLA personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2021–2022 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

229. UCLA personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2022–2023 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

230. Failures to conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges evidence inadequate Monitoring Implementation Plan development and implementation.

231. UCLA personnel did not record visual observations of all areas of

industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2018–2019 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

232. UCLA personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2019–2020 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

233. UCLA personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2020–2021 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

234. UCLA personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2021–2022 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

235. UCLA personnel has not recorded visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2022–2023 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

236. UCLA's failure to record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges further evidences inadequate Monitoring Implementation Plan development and implementation.

237. Public weather data establish that the Facility failed to collect sufficient storm water samples during Qualifying Storm Events ("QSEs") taking place on dates and at times when the Facility was open. *See* EXHIBIT 1-Appendix 5 (List of Qualifying Storm Events from July 2018–June 2023).

238. UCLA has also collected and submitted sampling data from rain events that are not Qualifying Storm Events. *See id.*

239. UCLA's failure to collect sufficient samples from Qualifying Storm Events further evidences inadequate Monitoring Implementation Plan development and implementation.

240. UCLA has failed to analyze samples for all pollutants required by the General Permit, including without limitation pollutants identified through the pollutant source assessment and required by the General Permit; and pollutants emitted during industrial activities from the Facility such as nitrogen oxides, ammonia, cadmium, PAHs, arsenic, and mercury. General Permit § XI.B.6.

241. UCLA's failures to analyze storm water samples for all required pollutants further evidence inadequate Monitoring Implementation Plan development and implementation.

242. Every day the Facility operates with an inadequately implemented Monitoring Plan is a separate and distinct violation of the General Permit and Act.

243. UCLA has been in daily and continuous violation of the General Permit's Monitoring Plan requirements, and subject to civil penalties for all such violations, since at least June 28, 2018.

244. These violations are ongoing, and LA Waterkeeper will include

1 additional violations when information becomes available.

2 **E. Stormwater Sample Collection and Analysis**

3 245. The storm water sample collected by UCLA at the Facility's sampling

4 point on November 29, 2018 contained copper concentrations of 0.0426 mg/L, which

5 exceeds the 0.014 mg/L U.S. EPA Benchmark for copper.

6 246. The November 29, 2018 storm water sample collected by UCLA at the

7 Facility's sampling point containing copper concentrations of 0.0426 mg/L also

8 exceeds 0.0332 mg/L NAL for copper.

9 247. The November 29, 2018 storm water sample collected by UCLA at the

10 Facility's sampling point containing copper concentrations of 0.0426 mg/L also

11 exceeds the 0.013 mg/L CTR standard for copper.

12 248. The storm water sample collected by UCLA at the Facility's sampling

13 point on November 29, 2018 contained zinc concentrations of 0.841 mg/L, which

14 exceeds the 0.12 mg/L U.S. EPA Benchmark for zinc.

15 249. The November 29, 2018 storm water sample collected by UCLA at the

16 Facility's sampling point containing zinc concentrations of 0.841 mg/L also exceeds

17 the 0.26 mg/L NAL for zinc.

18 250. The November 29, 2018 storm water sample collected by UCLA at the

19 Facility's sampling point containing zinc concentrations of 0.841 mg/L also exceeds

20 the 0.12 mg/L CTR standard for zinc.

21 251. The storm water sample collected by UCLA at the Facility's sampling

22 point on November 29, 2018 contained iron concentrations of 1.26 mg/L, which

23 exceeds the 1.0 mg/L U.S. EPA Benchmark for iron.

252.    The November 29, 2018 storm water sample collected by UCLA at the Facility's sampling point containing iron concentrations of 1.26 mg/L also exceeds the 1.0 mg/L NAL for iron.

253.    The storm water sample collected by UCLA at the Facility's sampling point on January 31, 2019 contained copper concentrations of 0.101 mg/L, which exceeds the 0.014 mg/L U.S. EPA Benchmark for copper.

254.    The January 31, 2019 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.101 mg/L also exceeds the 0.0332 mg/L NAL for copper.

255.    The January 31, 2019 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.101 mg/L also exceeds the 0.013 mg/L CTR standard for copper.

256.    The storm water sample collected by UCLA at the Facility's sampling point on January 31, 2019 contained zinc concentrations of 1.56 mg/L, which exceeds the 0.12 mg/L U.S. EPA Benchmark for zinc.

257.    The January 31, 2019 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 1.56 mg/L also exceeds the 0.26 mg/L NAL for zinc.

258.    The January 31, 2019 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 1.56 mg/L also exceeds the 0.12 mg/L CTR standard for zinc.

259.    The storm water sample collected by UCLA at the Facility's sampling point on January 31, 2019 contained iron concentrations of 3.43 mg/L, which exceeds

the 1.0 mg/L U.S. EPA Benchmark for iron.

260. The January 31, 2019 storm water sample collected by UCLA at the Facility's sampling point containing iron concentrations of 3.43 mg/L also exceeds the 1.0 mg/L NAL for iron.

261. The storm water sample collected by UCLA at the Facility's sampling point on January 31, 2019 contained total suspended solids concentrations of 143 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids.

262. The January 31, 2019 storm water sample collected by UCLA at the Facility's sampling point containing total suspended solids concentrations of 143 mg/L also exceeds the 100 mg/L NAL for total suspended solids.

263. The storm water sample collected by UCLA at the Facility's sampling point on February 14, 2019 contained copper concentrations of 0.032 mg/L, which exceeds the 0.014 mg/L U.S. EPA Benchmark for copper.

264. The February 14, 2019 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.032 mg/L also exceeds the 0.013 mg/L CTR standard for copper.

265. The storm water sample collected by UCLA at the Facility's sampling point on February 14, 2019 contained zinc concentrations of 0.52 mg/L, which exceeds the 0.12 mg/L U.S. EPA Benchmark for zinc.

266. The February 14, 2019 storm water sample collected by UCLA at the Facility's sampling point contained zinc concentrations of 0.52 mg/L also exceeds the 0.26 mg/L NAL for zinc.

267. The February 14, 2019 storm water sample collected by UCLA at the

Facility's sampling point contained zinc concentrations of 0.52 mg/L also exceeds the 0.12 mg/L CTR standard for zinc.

268. The storm water sample collected by UCLA at the Facility's sampling point on November 27, 2019 contained copper concentrations of 0.148 mg/L, which exceeds the 0.014 mg/L U.S. EPA Benchmark for copper.

269. The November 27, 2019 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.148 mg/L also exceeds the 0.0332 mg/L NAL for copper.

270. The November 27, 2019 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.148 mg/L also exceeds the 0.013 mg/L CTR standard for copper.

271. The storm water sample collected by UCLA at the Facility's sampling point on November 27, 2019 contained zinc concentrations of 2.13 mg/L, which exceeds the 0.12 mg/L U.S. EPA Benchmark for zinc.

272. The November 27, 2019 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 2.13 mg/L also exceeds the 0.26 mg/L NAL for zinc.

273. The November 27, 2019 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 2.13 mg/L also exceeds the 0.12 mg/L CTR standard for zinc.

274. The storm water sample collected by UCLA at the Facility's sampling point on November 27, 2019 contained iron concentrations of 1.24 mg/L, which exceeds the 1.0 mg/L U.S. EPA Benchmark for iron.

275. The November 27, 2019 storm water sample collected by UCLA at the Facility's sampling point containing iron concentrations of 1.24 mg/L also exceeds the 1.0 mg/L NAL for iron.

276. The storm water sample collected by UCLA at the Facility's sampling point on December 4, 2019 contained copper concentrations of 0.147 mg/L, which exceeds the 0.014 mg/L U.S. EPA Benchmark for copper.

277. The December 4, 2019 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.147 mg/L also exceeds the 0.0332 mg/L NAL for copper.

278. The December 4, 2019 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.147 mg/L also exceeds the 0.013 mg/L CTR standard for copper.

279. The storm water sample collected by UCLA at the Facility's sampling point on December 4, 2019 contained zinc concentrations of 1.64 mg/L, which exceeds the 0.12 mg/L U.S. EPA Benchmark for zinc.

280. The December 4, 2019 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 1.64 mg/L also exceeds the 0.26 mg/L NAL for zinc.

281. The December 4, 2019 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 1.64 mg/L also exceeds the 0.12 mg/L CTR standard for zinc.

282. The storm water sample collected by UCLA at the Facility's sampling point on March 10, 2020 contained copper concentrations of 0.2 mg/L, which exceeds

the 0.014 mg/L U.S. EPA Benchmark for copper.

283. The March 10, 2020 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.2 mg/L also exceeds the 0.0332 mg/L NAL for copper.

284. The March 10, 2020 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.2 mg/L also exceeds the 0.013 mg/L CTR standard for copper.

285. The storm water sample by UCLA at the Facility's sampling point on March 10, 2020 contained zinc concentrations of 2.56 mg/L, which exceeds the 0.12 mg/L U.S. EPA Benchmark for zinc.

286. The March 10, 2020 storm water sample by UCLA at the Facility's sampling point contained zinc concentrations of 2.56 mg/L also exceeds the 0.26 mg/L NAL for zinc.

287. The March 10, 2020 storm water sample by UCLA at the Facility's sampling point contained zinc concentrations of 2.56 mg/L also exceeds the 0.12 mg/L CTR standard for zinc.

288. The storm water sample collected by UCLA at the Facility's sampling point on March 10, 2020 contained total suspended solids concentrations of 173 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids.

289. The March 10, 2020 storm water sample collected by UCLA at the Facility's sampling point containing total suspended solids concentrations of 173 mg/L also exceeds the 100 mg/L NAL for total suspended solids.

290. The storm water sample collected by UCLA at the Facility's sampling

point on March 16, 2020 contained copper concentrations of 0.0952 mg/L, which exceeds the 0.014 mg/L U.S. EPA Benchmark for copper.

291. The March 16, 2020 storm water sample collected by UCLA at the Facility's sampling point contained copper concentrations of 0.0952 mg/L also exceeds the 0.0332 mg/L NAL for copper.

292. The March 16, 2020 storm water sample collected by UCLA at the Facility's sampling point contained copper concentrations of 0.0952 mg/L also exceeds the 0.013 mg/L CTR standard for copper.

293. The storm water sample by UCLA at the Facility's sampling point on March 16, 2020 contained zinc concentrations of 1.49 mg/L, which exceeds the 0.12 mg/L U.S. EPA Benchmark for zinc.

294. The March 16, 2020 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 1.49 mg/L also exceeds the 0.26 mg/L NAL for zinc.

295. The March 16, 2020 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 1.49 mg/L also exceeds the 0.12 mg/L CTR standard for zinc.

296. The storm water sample collected by UCLA at the Facility's sampling point on December 28, 2020 contained copper concentrations of 0.227 mg/L, which exceeds the 0.014 mg/L U.S. EPA Benchmark for copper.

297. The December 28, 2020 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.227 mg/L also exceeds the 0.0332 mg/L NAL for copper.

298. The December 28, 2020 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.227 mg/L also exceeds the 0.0137 mg/L NEL for copper.

299. The storm water sample collected by UCLA at the Facility's sampling point on December 28, 2020 contained zinc concentrations of 3.45 mg/L, which exceeds the 0.12 mg/L U.S. EPA Benchmark for zinc.

300. The December 28, 2020 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 3.45 mg/L also exceeds the 0.26 mg/L NAL for zinc.

301. The December 28, 2020 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 3.45 mg/L also exceeds the 0.12 mg/L CTR standard for zinc.

302. The storm water sample collected by UCLA at the Facility's sampling point on December 28, 2020 contained iron concentrations of 2.01 mg/L, which exceeds the 1.0 mg/L U.S. EPA Benchmark for iron.

303. The December 28, 2020 storm water sample collected by UCLA at the Facility's sampling point containing iron concentrations of 2.01 mg/L also exceeds the 1.0 mg/L NAL for iron.

304. The storm water sample collected by UCLA at the Facility's sampling point on December 28, 2020 contained total suspended solids concentrations of 173 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids.

305. The December 28, 2020 storm water sample collected by UCLA at the Facility's sampling point containing total suspended solids concentrations of 173

mg/L also exceeds the 100 mg/L NAL for total suspended solids.

306. The storm water sample collected by UCLA at the Facility's sampling point on January 28, 2021 contained copper concentrations of 0.0893 mg/L, which exceeds the 0.014 mg/L U.S. EPA Benchmark for copper.

307. The January 28, 2021 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.0893 mg/L also exceeds the 0.0332 mg/L NAL for copper.

308. The January 28, 2021 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.0893 mg/L also exceeds the 0.0137 mg/L NEL for copper.

309. The storm water sample collected by UCLA at the Facility's sampling point on January 28, 2021 contained zinc concentrations of 0.986 mg/L, which exceeds the 0.12 mg/L U.S. EPA Benchmark for zinc.

310. The January 28, 2021 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 0.986 mg/L also exceeds the 0.26 mg/L NAL for zinc.

311. The January 28, 2021 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 0.986 mg/L also exceeds the 0.12 mg/L CTR standard for zinc.

312. The storm water sample collected by UCLA at the Facility's sampling point on January 28, 2021 contained iron concentrations of 1.83 mg/L, which exceeds the 1.0 mg/L U.S. EPA Benchmark for iron.

313. The January 28, 2021 storm water sample collected by UCLA at the

Facility's sampling point containing iron concentrations of 1.83 mg/L also exceeds the 1.0 mg/L NAL for iron.

314.   The storm water sample collected by UCLA at the Facility's sampling point on March 10, 2021 contained copper concentrations of 0.112 mg/L, which exceeds the 0.014 mg/L U.S. EPA Benchmark for copper.

315.   The March 10, 2021 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.112 mg/L also exceeds the 0.0332 mg/L NAL for copper.

316.   The March 10, 2021 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.112 mg/L also exceeds the 0.0137 mg/L NEL for copper.

317.   The storm water sample collected by UCLA at the Facility's sampling point on March 10, 2021 contained zinc concentrations of 0.791 mg/L, which exceeds the 0.12 mg/L U.S. EPA Benchmark for zinc.

318.   The March 10, 2021 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 0.791 mg/L also exceeds the 0.26 mg/L NAL for zinc.

319.   The March 10, 2021 storm water sample collected by UCLA at the Facility's sampling point containing zinc concentrations of 0.791 mg/L also exceeds the 0.12 mg/L CTR standard for zinc.

320.   The storm water sample collected by UCLA at the Facility's sampling point on March 10, 2021 contained iron concentrations of 1.26 mg/L, which exceeds the 1.0 mg/L U.S. EPA Benchmark for iron.

321.   The March 10, 2021 storm water sample collected by UCLA at the Facility's sampling point containing iron concentrations of 1.26 mg/L also exceeds and the 1.0 mg/L NAL for iron.

322.   The storm water sample collected by UCLA at the Facility's sampling point on October 25, 2021 contained copper concentrations of 0.5 mg/L, which exceeds the 0.00519 mg/L U.S. EPA Benchmark for copper.

323.   The October 25, 2021 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.5 mg/L also exceeds the 0.0332 mg/L NAL for copper.

324.   The October 25, 2021 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.5 mg/L also exceeds the 0.0137 mg/L NEL for copper.

325.   The storm water sample by UCLA at the Facility's sampling point on October 25, 2021 contained zinc concentrations of 2.3 mg/L, which exceeds the 0.132 mg/L U.S. EPA Benchmark for zinc.

326.   The October 25, 2021 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 2.3 mg/L also exceeds the 0.26 mg/L NAL for zinc.

327.   The October 25, 2021 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 2.3 mg/L also exceeds the 0.10477 mg/L NEL for zinc.

328.   The October 25, 2021 storm water sample collected by UCLA at the Facility's sampling point containing iron concentrations of 2.7 mg/L also exceeds the

1.0 mg/L NAL for iron.

329. The storm water sample collected by UCLA at the Facility's sampling point on October 25, 2021 contained total suspended solids concentrations of 254 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids.

330. The October 25, 2021 storm water sample collected by UCLA at the Facility's sampling point containing total suspended solids concentrations of 254 mg/L also exceeds the 100 mg/L NAL for total suspended solids.

331. The storm water sample collected by UCLA at the Facility's sampling point on December 9, 2021 contained copper concentrations of 0.34 mg/L, which exceeds the 0.00519 mg/L U.S. EPA Benchmark for copper.

332. The December 9, 2021 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.34 mg/L also exceeds the 0.0332 mg/L NAL for copper.

333. The December 9, 2021 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.34 mg/L also exceeds the 0.0137 mg/L NEL for copper.

334. The storm water sample by UCLA at the Facility's sampling point on December 9, 2021 contained zinc concentrations of 1.3 mg/L, which exceeds the 0.132 mg/L U.S. EPA Benchmark for zinc.

335. The December 9, 2021 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 1.3 mg/L also exceeds the 0.26 mg/L NAL for zinc.

336. The December 9, 2021 storm water sample by UCLA at the Facility's

sampling point containing zinc concentrations of 1.3 mg/L also exceeds the 0.10477 mg/L NEL for zinc.

337. The December 9, 2021 storm water sample collected by UCLA at the Facility's sampling point containing iron concentrations of 2.8 mg/L also exceeds the 1.0 mg/L NAL for iron.

338. The storm water sample collected by UCLA at the Facility's sampling point on December 9, 2021 contained total suspended solids concentrations of 127 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids.

339. The December 9, 2021 storm water sample collected by UCLA at the Facility's sampling point containing total suspended solids concentrations of 127 mg/L also exceeds the 100 mg/L NAL for total suspended solids.

340. The storm water sample collected by UCLA at the Facility's sampling point on March 28, 2022 contained copper concentrations of 0.93 mg/L, which exceeds the 0.00519 mg/L U.S. EPA Benchmark for copper.

341. The March 28, 2022 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.93 mg/L also exceeds the 0.0332 mg/L NAL for copper.

342. The March 28, 2022 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.93 mg/L also exceeds the 0.0137 mg/L NEL for copper.

343. The storm water sample by UCLA at the Facility's sampling point on March 28, 2022 contained zinc concentrations of 3.0 mg/L, which exceeds the 0.132 mg/L U.S. EPA Benchmark for zinc.

344. The March 28, 2022 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 3.0 mg/L also exceeds the 0.26 mg/L NAL for zinc.

345. The March 28, 2022 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 3.0 mg/L also exceeds the 0.10477 mg/L NEL for zinc.

346. The March 28, 2022 storm water sample collected by UCLA at the Facility's sampling point containing iron concentrations of 2.9 mg/L also exceeds the 1.0 mg/L NAL for iron.

347. The storm water sample by UCLA at the Facility's sampling point on March 28, 2022 contained pH concentrations of 9.06 s.u., which exceeds the 6.0–9.0 s.u. U.S. EPA Benchmark for pH.

348. The March 28, 2022 storm water sample by UCLA at the Facility's sampling point containing pH concentrations of 9.06 s.u. also exceeds the 6.0–9.0 s.u. NAL for pH.

349. The storm water sample collected by UCLA at the Facility's sampling point on March 28, 2022 contained total suspended solids concentrations of 304 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids.

350. The March 28, 2022 storm water sample collected by UCLA at the Facility's sampling point containing total suspended solids concentrations of 304 mg/L also exceeds the 100 mg/L NAL for total suspended solids.

351. The storm water sample collected by UCLA at the Facility's sampling point on November 8, 2022 contained copper concentrations of 0.146 mg/L, which

exceeds the 0.00519 mg/L U.S. EPA Benchmark for copper.

352. The November 8, 2022 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.146 mg/L also exceeds the 0.0332 mg/L NAL for copper.

353. The November 8, 2022 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.146 mg/L also exceeds the 0.0137 mg/L NEL for copper.

354. The storm water sample by UCLA at the Facility's sampling point on November 8, 2022 contained zinc concentrations of 1.04 mg/L, which exceeds the 0.132 mg/L U.S. EPA Benchmark for zinc.

355. The November 8, 2022 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 1.04 mg/L also exceeds the 0.26 mg/L NAL for zinc.

356. The November 8, 2022 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 1.04 mg/L also exceeds the 0.10477 mg/L NEL for zinc.

357. The storm water sample collected by UCLA at the Facility's sampling point on December 11, 2022 contained copper concentrations of 0.586 mg/L, which exceeds the 0.00519 mg/L U.S. EPA Benchmark for copper.

358. The December 11, 2022 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.586 mg/L also exceeds the 0.0332 mg/L NAL for copper.

359. The December 11, 2022 storm water sample collected by UCLA at the

Facility's sampling point containing copper concentrations of 0.586 mg/L also exceeds the 0.0137 mg/L NEL for copper.

360. The storm water sample by UCLA at the Facility's sampling point on December 11, 2022 contained zinc concentrations of 2.19 mg/L, which exceeds the 0.132 mg/L U.S. EPA Benchmark for zinc.

361. The December 11, 2022 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 2.19 mg/L also exceeds the 0.26 mg/L NAL for zinc.

362. The December 11, 2022 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 2.19 mg/L also exceeds the 0.10477 mg/L NEL for zinc.

363. The December 11, 2022 storm water sample collected by UCLA at the Facility's sampling point containing iron concentrations of 4.62 mg/L also exceeds the 1.0 mg/L NAL for iron.

364. The storm water sample collected by UCLA at the Facility's sampling point on December 11, 2022 contained total suspended solids concentrations of 101 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended solids.

365. The December 11, 2022 storm water sample collected by UCLA at the Facility's sampling point containing total suspended solids concentrations of 101 mg/L also exceeds the 100 mg/L NAL for total suspended solids.

366. The storm water sample collected by UCLA at the Facility's sampling point on January 4, 2023 contained copper concentrations of 0.126 mg/L, which exceeds the 0.00519 mg/L U.S. EPA Benchmark for copper.

367. The January 4, 2023 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.126 mg/L also exceeds the 0.0332 mg/L NAL for copper.

368. The January 4, 2023 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.126 mg/L also exceeds the 0.0137 mg/L NEL for copper.

369. The storm water sample by UCLA at the Facility's sampling point on January 4, 2023 contained zinc concentrations of 0.907 mg/L, which exceeds the 0.132 mg/L U.S. EPA Benchmark for zinc.

370. The January 4, 2023 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 0.907 mg/L also exceeds the 0.26 mg/L NAL for zinc.

371. The January 4, 2023 storm water sample by UCLA at the Facility's sampling point containing zinc concentrations of 0.907 mg/L also exceeds the 0.10477 mg/L NEL for zinc.

372. The storm water sample collected by UCLA at the Facility's sampling point on January 9, 2023 contained copper concentrations of 0.0611 mg/L, which exceeds the 0.00519 mg/L U.S. EPA Benchmark for copper.

373. The January 9, 2023 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.0611 mg/L also exceeds the 0.0332 mg/L NAL for copper.

374. The January 9, 2023 storm water sample collected by UCLA at the Facility's sampling point containing copper concentrations of 0.0611 mg/L also

1  exceeds the 0.0137 mg/L NEL for copper.

2      375.   The storm water sample by UCLA at the Facility's sampling point on

3  January 9, 2023 contained zinc concentrations of 0.665 mg/L, which exceeds the

4  0.132 mg/L U.S. EPA Benchmark for zinc.

5      376.   The January 9, 2023 storm water sample by UCLA at the Facility's

6  sampling point containing zinc concentrations of 0.665 mg/L also exceeds the 0.26

7  mg/L NAL for zinc.

8      377.   The January 9, 2023 storm water sample by UCLA at the Facility's

9  sampling point containing zinc concentrations of 0.665 mg/L also exceeds the

10  0.10477 mg/L NEL for zinc.

11      378.   A true and accurate summary of the data (as reported by UCLA to the

12  State Board via the SMARTS database) that is the basis for allegations contained in

13  paragraphs 247 to 379 is contained in EXHIBIT 1-Appendices 1 (comparing UCLA's

14  sampling data analyses to U.S. EPA Benchmark pollution standards), 2 (comparing

15  UCLA's sampling data analyses to CTR pollution standards), 4 (comparing UCLA's

16  sampling data analyses to NEL pollution standards), 6 (comparing UCLA's sampling

17  data analyses to NAL pollution standards) attached to, and incorporated by reference

18  into, this Complaint.

19      379.   Every single storm water sample analyzed since November 29, 2018

20  contains copper and zinc concentrations that exceed the U.S. EPA Benchmarks for

21  those pollutants.

22      **F. Discharge Prohibitions**

23      380.   A review of all publicly available information establishes that UCLA has

and continues to violate the General Permit Discharge Prohibitions. *See* e.g., General Permit, §§ III.B, D.

381. These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**G. BAT/BCT and Best Management Practices**

382. On information and belief, UCLA has failed to implement minimum and advanced Best Management Practices employed by similar industrial facilities representing BAT/BCT.

383. UCLA's pattern of exceeding U.S. EPA Benchmarks demonstrates that the Facility is operating with BMPs that are insufficient and/or ineffective to meet the BAT/BCT standard.

384. UCLA has not sufficiently evaluated and amended Best Management Practices in response to Exceedance Response Actions status and Annual Comprehensive Facility Compliance Evaluations, as required by the General Permit.

385. Best Management Practices implemented by UCLA at the Facility have not prevented, and will not prevent, the Facility's pollutant sources from contributing pollutants to storm water discharged to waters of the United States that violate the technology-based and water quality-based effluent limitations.

386. Each day UCLA operates the Facility without BMPs achieving BAT/BCT-level pollutant reductions is a separate and distinct violation of the General Permit's technology-based mandates and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

387. These violations are ongoing, and LA Waterkeeper will include

1    additional violations when information becomes available.

2        **H. Receiving Water Limitations**

3        388.   UCLA has violated and continues to violate the General Permit's

4    Receiving Water Limitations. General Permit § VI.A–C.

5        389.   UCLA's storm water sampling data submitted to the State Board

6    establishes persistent exceedances of the CTR's "end of pipe" numeric limits for lead,

7    copper, and zinc between November 29, 2018 and June 30, 2020. *See* EXHIBIT 1-

8    Appendix 2 (comparing UCLA's sampling data analyses to CTR pollution limits).

9        390.   The exceedance of CTR pollution limits also establishes that the

10   Facility's storm water discharges adversely affect human health and the environment,

11   and threaten to cause pollution, a public nuisance, or both.

12       391.   UCLA's own self-monitoring reports submitted under penalty of law

13   establish consistent exceedances of CTR values, and the Facility's BMPs have not

14   been changed or adapted sufficiently to address these exceedances.

15       392.   UCLA's storm water sampling data establishes that the Facility is

16   causing and/or contributing to violations of applicable WQSs in violation of the

17   General Permit's Receiving Water Limitation. General Permit § VI.A–C.

18       393.   UCLA has violated and continues to violate the General Permit's water

19   quality-based effluent limitations. General Permit § VII.A.

20       394.   Despite exceeding applicable WQSs, UCLA has not, to LA

21   Waterkeeper's knowledge based on publicly available records, completed any Water

22   Quality Based Corrective Actions as required. See General Permit, § XX.B.

23       395.   UCLA is liable for violations of the Act and General Permit's Receiving

Water Limitations for each day of significant rainfall from June 28, 2018 to the present, and for violations of related remedial mandates on an ongoing basis. *See* EXHIBIT 1-Appendix 3 (List of significant rainfall events from July 2018–June 2023).

396.   UCLA is liable for violations of the Act and General Permit's water quality-based effluent limitations for each day of significant rainfall from June 28, 2018 to the present, and for violations of related remedial mandates on an ongoing basis. *See id*.

397.   These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**I.  UCLA's Violation of the General Permit's TMDL-Specific Requirements and Numeric Effluent Limitations**

398.   As described above, the General Permit was amended in 2018 to, among other things, incorporate NELs consistent with Ballona Creek Metals TMDL waste load allocations for industrial storm water discharges. General Permit, § VII.A.1, Attachment E.

399.   The General Permit's NELs became effective on July 1, 2020.

400.   The Facility's sampling data for rain events after July 1, 2020, demonstrates that UCLA has violated NELs for copper and zinc every time the discharge was sampled. UCLA exceeded NELs for copper and zinc on two occasions each during the 2020–2021 Reporting Year, exceeded NEL for copper and zinc on three occasions each during the 2021–2022 Reporting Year, and exceeded NEL for copper and zinc on four occasions each during the 2022–2023 Reporting Year. *See*

Appendix 4 (comparing UCLA's sampling data to NEL concentrations).

401.   Each exceedance of an applicable NEL is a violation of the General Permit, and an independent violation of the Act.

402.   These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**J.  Exceedance Response Actions**

403.   UCLA has violated and continues to violate the General Permit's ERA requirements.

404.   As described above, the General Permit requires permittees to develop and implement ERAs whenever a NAL exceedance occurs during a reporting year.

405.   The Facility's sampling data demonstrates that NAL exceedances occurred for copper and zinc concentrations during every reporting year since June 28, 2018.

406.   The Facility's sampling data demonstrates that NAL exceedances occurred for iron concentrations during the 2018–2019 Reporting Year, 2020–2021 Reporting Year, 2021–2022 Reporting Year, and 2022–2023 Reporting Year.

407.   The Facility's sampling data demonstrates that NAL exceedances occurred for TSS concentrations during the 2019–2020 Reporting Year and 2021–2022 Reporting Year.

408.   As a result of the Facility's self-reported sampling data indicating persistent NAL exceedances, the Co-Gen Facility was in ERA Level 1 for TSS in 2020 and 2022, and ERA Level 2 for zinc since 2017 and copper and iron since 2018.

409.   Sampling data demonstrate that UCLA's ERA reports failed to identify,

and UCLA failed to implement, BMPs to prevent future NEL and NAL exceedances.

410. In 2022, UCLA's ERA report referenced a capture and reuse system, required by the 2021 TSO. Yet, to date, UCLA has not installed capture and reuse or any other BMP sufficient to eliminate or even reduce the consistent metals violations in storm water discharges.

411. A discharger that is not in full compliance with the Level 1 status and/or Level 2 status ERA requirements is in violation of the General Permit. General Permit, § I.N.77.

412. These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**K. The 2021 TSO Does Not Bar Citizen Enforcement Under the Act**

413. The Clean Water Act provides that "any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a civil penalty action under…section 1365[.]" 33 U.S.C. § 1319(g)(6)(A)(ii).

414. No civil penalty action under section 1365 may proceed if a state agency: (1) commences an enforcement action under a state law "comparable" to the Clean Water Act; and (2) "diligently prosecutes" that enforcement action. *Friends of Frederick Seig Grove #94 v. Sonoma Cnty. Water Agency*, 124 F. Supp. 2d 1161, 1170 (N.D. Cal. 2000).

415. The Ninth Circuit has determined that "diligent prosecution" under section 1319(g)(6)(A) applies only when: (a) the comparable state law contains penalty provisions; and (b) a penalty is/was actually assessed under the state law.

*Friends of Mariposa Creek v. Mariposa Pub. Utils. Dist.*, 2015 U.S. Dist. LEXIS 128783, *14 (E.D. Cal. Sept. 24, 2015); *see also Cal. Sportfishing Prot. Alliance v Chico Scrap Metal, Inc.*, 728 F.3d 868, 877 (9th Cir. 2013).

416.   Here, California Water Code section 13385 is a state law comparable to the Clean Water Act that contains penalty provisions.

417.   The Regional Board did not assess any penalties on UCLA via the 2021 TSO.

418.   While the Regional Board may have assessed a $3,000.00 "settlement" for failures to sample and report timely, it is unclear whether that "settlement" was paid, and no penalty has been paid for violations of effluent limitations, receiving water limitations, inadequate Pollution Prevention Plans, or other violations of the General Permit noticed in this letter.

419.   Further the Regional Board has assessed no penalty for or otherwise enforced for UCLA's failure to comply with the 2021 TSO itself.

420.   Therefore the 2021 TSO and the "settlement" do not constitute "diligent prosecution" by a state agency for purposes of section 1365 civil penalty actions. *See Friends of Mariposa Creek v. Mariposa Pub. Utils. Dist.*, 2015 U.S. Dist. LEXIS 128783, *14 (E.D. Cal. Sept. 24, 2015) ("A defendant's 'potential liability' for penalties in an administrative action is not enough; the penalties must 'actually have been assessed.'")

## VI.        CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in
Violation of the General Permit's Technology-Based Effluent**

**Limitations and the Act**
**(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

421. LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

422. UCLA has failed, and continues to fail, to reduce or prevent pollutants associated with industrial activities from being discharged to waters of the United States through the implementation of Best Management Practices at the Co-Gen Facility that achieve the technology-based BAT/BCT treatment standards.

423. UCLA discharges storm water from the Co-Gen Facility containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

424. Defendant's failures to develop and/or implement Best Management Practices that achieve the pollutant discharge reductions attainable via BAT or BCT at the Co-Gen Facility are violations of the General Permit's technology-based effluent limitations and the Act. *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

425. Defendant violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are discharged from the Co-Gen Facility.

426. Each and every violation of the General Permit's technology-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

427. Defendant's violations of the General Permit's technology-based effluent limitations and the Act are ongoing and continuous.

428. UCLA is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from June 28, 2018 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

429. An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

430. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in Violation
of the General Permit's Water Quality-Based Effluent Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

431. LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

432. Since at least June 28, 2018, Defendant has discharged contaminated storm water from the Co-Gen Facility containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards in violation of the General Permit's water quality-based effluent limitations. *See* General Permit, § VI.A.

433. Since at least June 28, 2018, Defendant has discharged contaminated storm water from the Co-Gen Facility containing levels of pollutants that adversely impact human health and the environment in violation of the General Permit's water quality-based effluent limitations. *See* General Permit, § VI.B.

434. Since at least June 28, 2018, Defendant has discharged contaminated storm water from the Co-Gen Facility containing levels of pollutants that threaten to cause pollution or a public nuisance in violation of the General Permit's water quality-based effluent limitations. *See* General Permit, § VI.C.

435. Since at least June 28, 2018, Defendant has discharged contaminated storm water from the Co-Gen Facility containing concentrations of copper, lead, and zinc above the effluent limitation implementing the interim WLA for metals in the General Permit. General Permit § VII.A.

436. LA Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards, adversely impact human health and/or the environment, and threaten to cause pollution or a public nuisance from the Co-Gen Facility, occur each time storm water was/is discharged from the Co-Gen Facility.

437. Defendant's violations of the General Permit's water quality-based effluent limitations are ongoing and continuous.

438. Each and every violation of any of the General Permit's water quality-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

439. Every day, since at least June 28, 2018, that Defendant has discharged polluted storm water from the Co-Gen Facility in violation of the General Permit's water quality-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. *See* 33 U.S.C. § 1311(a).

440. UCLA is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from June 28, 2018 to the present, pursuant to sections 309(d) and 505 of the Act. *See* 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

441. An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

442. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Failure to Prepare, Implement, Review, and Update**
**An Adequate Storm Water Pollution Prevention Plan**
**(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

443. LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

444. Defendant has not developed and implemented a legally adequate

Pollution Prevention Plan for the Co-Gen Facility, including failing to comply with those requirements detailed in paragraph 138 of this Complaint.

445.   Defendant's violations of the General Permit's Pollution Prevention Plan requirements are ongoing and continuous.

446.   Each day since June 28, 2018, that Defendant has not developed, implemented, and reviewed and updated a legally adequate Pollution Prevention Plan for the Co-Gen Facility is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

447.   Defendant has been in violation of the General Permit's Pollution Prevention Plan requirements every day since June 28, 2018. Violations continue each day that an adequate Pollution Prevention Plan for the Co-Gen Facility is not developed and fully implemented.

448.   UCLA is subject to an assessment of civil penalties for each and every violation of the Act occurring from June 28, 2018, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

449.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

450.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set

1  forth hereafter.

2  **FOURTH CAUSE OF ACTION**

3  **Defendant's Failure to Develop and Implement**

   **An Adequate Monitoring Implementation Plan**

4  **(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

5  451.  LA Waterkeeper re-alleges and incorporates all preceding paragraphs as

6  if fully set forth herein.

7  452.  Defendant has failed to collect storm water samples from all discharge

8  points at the Co-Gen Facility as required by the General Permit.

9  453.  Defendant has failed to collect storm water samples as required by the

10  General Permit, including without limitation failing to collect sufficient samples

11  during qualifying storm events during the 2018–2019, 2019–2020, 2020–2021, and

12  2021–2022 storm water years.

13  454.  Defendant has failed to analyze all storm water samples collected at the

14  Co-Gen Facility for all pollutants required by the General Permit including, without

15  limitation, pollutants emitted from the Facility for which Receiving Waters are

16  impaired such as arsenic, cadmium, mercury, and PAHs.

17  455.  Defendant has failed to comply with the General Permit's Water Quality

18  Based Corrective Actions. General Permit, § XX.B.

19  456.  Defendant has not developed and implemented a legally adequate

20  monitoring and reporting program, or Monitoring Implementation Plan, for the Co-

21  Gen Facility.

22  457.  Defendant's violations of the General Permit's Monitoring

23  Implementation Plan mandate are ongoing and continuous.

458.   Each day since June 28, 2018, that Defendant has not developed and implemented a lawful Monitoring Implementation Plan for the Co-Gen Facility and all areas of industrial activity in violation of the General Permit is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

459.   UCLA is subject to an assessment of civil penalties for each and every violation of the Act occurring from June 28, 2018 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

460.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

461.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.      Declare Defendant to have violated, and to be in violation of, the General Permit and Act as alleged herein;

b.      Enjoin Defendant from discharging polluted storm water from the Co-

Gen Facility except as authorized by the General Permit;

c. Order Defendant to immediately implement storm water pollution control technologies and measures that achieve BAT/BCT-level pollutant reductions, and that prevent pollutants in the Co-Gen Facility's storm water discharges from contributing to violations of any water quality standards;

d. Order Defendant to prepare a Pollution Prevention Plan consistent with the General Permit's requirements, and implement procedures to regularly review and update the Pollution Prevention Plan to ensure ongoing compliance with Pollution Prevention Plan requirements;

e. Order Defendant to prepare a Monitoring Implementation Plan consistent with the General Permit's requirements, and comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f. Order Defendant to pay civil penalties of up to $64,618.00 for each violation alleged herein pursuant to sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–.4;

g. Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

h. Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

i. Award any such other and further relief deemed appropriate by the Court.

DATED: September 1, 2023       Respectfully submitted,

By:    /s/ Daniel Cooper
         Daniel Cooper
         SYCAMORE LAW, INC.
         Attorney for Plaintiff